BIRCH, Circuit Judge,
Specially Concurring in the Denial of Rehearing En Banc:
The dissents to the denial of rehearing en banc both agree that the Equal Protection Clause challenge to the Florida stat *1276 ute at issue should have been embraced by our court. After a review of the Supreme Court’s decisions in Eisenstadt,[1] Moreno,[2] Cleburne,[3] and Romer,[4] the vociferous dissent by my sister jurist (for whom I have great respect and affection), liberally quoting from Justice O’Connor’s concurring opinion in Lawrence,[5] concludes that under a rational basis analysis or, alternatively, an animus-motivated analysis, the Florida adoption statute at issue is constitutionally flawed. In addition to the discussion by the unanimous panel in Lofton, 358 F.3d 804, 817-827, that reaches a contrary conclusion, I would offer the following additional considerations to balance those suggested by Judge Barkett’s spirited and well-crafted dissent.
The Lofton panel’s analysis and approach in this case was premised on a fundamental principal or philosophy, articulated well by Justice Felix Frankfurter in his concurring opinion in Dennis v. United States, 341 U.S. 494, 525, 71 S.Ct. 857, 875, 95 L.Ed. 1137 (1951), when he observed:
Courts are not representative bodies. They are not designed to be a good reflex of a democratic society.... Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.
The dissent, instead of approaching the issue as the panel did in this case by asking “[Wjhether the Florida legislature could have reasonably believed that prohibiting adoption into homosexual environments would further its interest in placing adoptive children in homes that will provide them with optimal developmental conditions,” Lofton, 358 F.3d at 820, seeks to disparage a fundamental rationale of the Florida legislature. Both the Florida attorney general and a Florida appellate court, specifically considering an equal protection challenge to the statute, articulated a rational and arguable basis for the statute: “[Wjhatever causes a person to become a homosexual, it is clear that the state cannot know the sexual preferences that a child will exhibit as an adult. Statistically, the state does know that a very high percentage of children available for adoption will develop heterosexual preferences.” Fla. Dep’t of Health & Rehab. Servs. v. Cox, 627 So.2d 1210, 1229 (Fla.Dist.Ct.App.1993). Stated differently, the mainstream of contemporary American family life consists of heterosexual individuals. Can it be seriously contended that an arguably rational basis does not exist for placing adoptive children in the mainstream of American family life? And that to do so is irrational? I think not. In fact, the Congress of the United States in determining what is in the best interests of other special needs children, the handicapped, has passed laws focused on educationally mainstreaming such children. See, e.g., 20 U.S.C. § 1412(a)(5)(A) (“To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care *1277 facilities, are educated with children who are not disabled”).
It is also worthy to note that the dissent would focus on conduct by Florida’s executive branch (the Department of Children and Family Services [“the Department”]) and Florida’s judicial branch (citing just two isolated custody determinations), which the dissent argues is inconsistent with the legislature’s arguably rational bases. Recall that the Supreme Court has held: “It could be that the assumptions underlying these rationales are erroneous, but the very fact that they are arguable is sufficient, on rational-basis review, to immunize the legislative choice from constitutional challenge.” Heller v. Doe, 509 U.S. 312, 333, 113 S.Ct. 2637, 2649-50, 125 L.Ed.2d 257 (1993) (citation and internal punctuation marks omitted) (emphasis mine). Moreover, post-legislation conduct, including the passage of regulations, by the executive agency that must find placements for parentless children, which may be at times inconsistent with the spirit, if not the letter, of a legislative enactment, should not weigh heavily in the calculus of rational basis review. The executive branch, acting through unelected bureaucrats who, while undoubtedly concerned about the best interests of their wards, often are motivated by other concerns such as coping with inadequate resources and an unmanageable number of unplaced children. As the Lofton panel recognized:
The Equal Protection Clause of the Fourteenth Amendment proclaims that “[n]o State shall ... deny to any person within its jurisdiction the equal protection of laws.” U.S. Const, amend. XIV, § 1. The central mandate of the equal protection guarantee is that “[t]he sovereign may not draw distinctions between individuals based solely on differences that are irrelevant to a legitimate governmental objective.” Lehr v. Robertson, 463 U.S. 248, 265, 103 S.Ct. 2985, 2995, 77 L.Ed.2d 614 (1983). Equal protection, however, does not forbid legislative classifications. Nordlinger v. Hahn, 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). “It simply keeps governmental decisionmakers from treating differently persons who are in áll relevant respects alike.” Id. Unless the challenged classification burdens a fundamental right or targets a suspect class, the Equal Protection Clause requires only that the classification be rationally related to a legitimate state interest. Romer v. Evans, 517 U.S. 620, 631, 116 S.Ct. 1620, 1627, 134 L.Ed.2d 855 (1996). As we have explained, Florida’s statute burdens no fundamental rights. Moreover, all of our sister circuits that have considered the question have declined to treat homosexuals as a suspect class.16 Because the present case involves neither a fundamental right nor a suspect class, we review the Florida statute under the rational-basis standard.
Rational-basis review, “a paradigm of judicial restraint;” does not provide “a license for courts to judge the wisdom, fairness, or logic of legislative choices.” F.C.C. v. Beach Communications, Inc., 508 U.S. 307, 313-14, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993) (citation -omitted). The question is simply whether the challenged legislation is- rationally related to a legitimate state interest. Heller v. Doe, 509 U.S. 312, 320, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993). Under this deferential standard, a legislative classification “is accorded a strong presumption of validity,” id. at 319, 113 S.Ct. at 2642, and “must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could. provide a rational basis for the classification,” id. at 320, 113 S.Ct. at 2642 (citation omitted). This holds true “even if the law seems unwise or works to the disadvantage of a *1278 particular group, or if the rationale for it seems tenuous.” Romer, 517 U.S. at 632, 116 S.Ct. at 1627. Moreover, a state has “no obligation to produce evidence to sustain the rationality of a statutory classification.” Heller, 509 U.S. at 320, 113 S.Ct. at 2643. Rather, “the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it, whether or not the basis has a foundation in the record.” Id. at 320-21, 113 S.Ct. at 2643 (citation omitted).
16Equal. Found. of Greater Cincinnati, Inc. v. City of Cincinnati, 128 F.3d 289 (6th Cir.1997); Holmes v. Cal. Army Nat’l Guard, 124 F.3d 1126 (9th Cir.1997); Richenberg v. Perry, 97 F.3d 256 (8th Cir.1996); Thomasson v. Perry, 80 F.3d 915 (4th Cir.1996); Steffan v. Perry, 41 F.3d 677 (D.C.Cir.1994); High Tech Gays v. Defense Indus. Sec. Clearance Office, 895 F.2d 563 (9th Cir.1990); Ben-Shalom v. Marsh, 881 F.2d 454 (7th Cir.1989); Woodward v. United States, 871 F.2d 1068 (Fed.Cir.1989); Town of Ball v. Rapides Parish Police Jury, 746 F.2d 1049 (5th Cir.1984); Rich v. Sec’y of the Army, 735 F.2d 1220 (10th Cir.1984).
Lofton, 358 F.3d. at 817-18. Citing some inconsistent actions by Florida bureaucrats in the Department and two isolated Florida judicial decisions hardly meets the burden “to negative every conceivable basis which might support [the legislative arrangement], whether or not the basis has a foundation in the record.” Heller, 509 U.S. at 320-21, 113 S.Ct. at 2643.
The dissent also sets up a “straw man” when it suggests: “[t]he panel also intimates in dicta that Florida has a legitimate interest in defending public morality by expressing disapproval of homosexuality.” Dissent (Barkett, J.) at 1300. The footnote was not motivated by some sort of homophobic agenda, but only acknowledged the argument advanced by Florida’s counsel that public morality was a rational basis and thus the panel stated, given our finding of a mainstreaming rationale as a rational basis, that “it is unnecessary for us to resolve the question [of a public morality basis].” Lofton, 358 F.3d at 819.
Turning now from the dissent’s attack on the rational basis predicate to its alternative “animus/analysis” challenge, I offer the following perspectives in counter-balance to the arguments by the dissent. The dissent advances a second equal protection argument in favor of striking down the Florida adoption statute’s categorical prohibition against practicing homosexual citizens. As I understand the dissent’s argument, once it is demonstrated that the motivation propelling a piece of legislation is animus, a different sort of analysis from a traditional “any-existing-rational-basis-will-justify” approach must be employed, as putatively mandated by Supreme Court precedents in Romer, Cleburne, Moreno and Eisenstadt. Under this “animus/analysis,” a court is required to examine whether the proffered reasons for the statute are pretextual — particularly in light of what the State (including its executive branch [here the Department] and judicial branch [courts awarding custody to homosexual parents, etc.]) does that is contradictory to the statute.
While a principled argument can be made on this equal protection animus/analysis that might result in invalidation of this statute, see Shahar v. Bowers, 114 F.3d 1097, 1125 (1997) (en banc) (Birch, J., dissenting), the Lofton panel was not willing to embrace that more adventurous leap and preferred to stay with a more traditional analytical approach that ignored the actual legislative history and instead searched for any rational basis.
*1279 The real point of disagreement between the Lofton panel and the dissent is whether rational-basis review should always uphold a law as long as there exists some “conceivable” rational basis — or whether there are certain instances that call for a “more searching” form of rational-basis review that examines the actual motivations underlying the law. Accordingly, I offer the counter-argument to the dissent’s “heightened rational-basis review” theory.
The dissent’s interpretation of Romer, Cleburne, Moreno and Eisenstadt — and its theory that these precedents call for a “more searching” form of rational-basis review — is summarized well in the following passage:
In all four cases, the Court concluded that the asserted justifications were not rationally related to the classification. Thus, the Court inferred that animus was the motivation behind the legislation and established that such a motivation could not constitute a legitimate state interest.
Dissent (Barkett, J.) at 1296.
Aside from Justice O’Connor’s Lawrence concurrence, I have found in the Supreme Court’s language no explicit support for the theory that rational-basis review should examine the actual motivation behind legislation (assuming that such a thing can be divined with any accuracy). I also note the Supreme Court’s own observation that “it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.” F.C.C. v. Beach Communications. Inc., 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993); see, also City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 48, 106 S.Ct. 925, 929, 89 L.Ed.2d 29 (1986) (“It is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive.”) (citation omitted).
Moreover, my review of the cases cited by the dissent fails to convince me that those opinions applied a “heightened” form of review as the dissent contends. In that vein, I offer my more conventional and measured reading of each of those precedents.
The Romer Court found Colorado’s Amendment 2 — a “sweeping and comprehensive” measure that imposed a “broad and undifferentiated disability” on the state’s homosexual residents — to be “inexplicable by anything but animus” because the breadth of the Amendment so exceeded its proffered rationales. 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). As I understand it, the fatal defect in Amendment 2 was not that the Court determined that actual animus motivated passage of the Amendment. Indeed, in contrast to the dissent’s scrutiny of the legislative history of the Florida statute, the Romer Court never examined the actual history of the plebiscite vote that led to passage of Amendment 2, nor the accom-panjdng campaign rhetoric or the “intent” of the electorate.
Instead, the Court found the proffered rationales so implausible that the Court inferred that animus was the only conceivable (as opposed to actual) rationale. See id. at 632, 116 S.Ct. at 1627 (The Amendment’s “sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects.”). In its pivotal language, the Court stated:
The primary rationale the State offers for Amendment 2 is respect for other citizens’ freedom of association, and in particular the liberties of landlords or employers who have personal or religious objections to homosexuality. Colorado also cites its interest in conserving *1280 resources to fight discrimination against other groups. The breadth of the amendment is so far removed from these particular justifications that we find it impossible to credit them. We cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective. It is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit.
Id. at 635, 116 S.Ct. at 1629.
In sum, I read Romer to stand for the proposition that when all the proffered rationales for a law are clearly and manifestly implausible, a reviewing court may infer that animus is the only explicable basis. And animus alone cannot constitute a legitimate government interest.
In City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), the Supreme Court invalidated, under the rational-basis test, a municipal zoning ordinance requiring a group home for the mentally retarded to obtain a special use permit. Id. at 435, 105 S.Ct. at 3252. Although the municipality offered various justifications for the ordinance, the Court could not discern how these justifications applied particularly to mentally retarded residents — but not to other groups of persons who could freely occupy the identical structure without a permit, such as boarding houses, fraternity houses, and nursing homes. Id. at 449-50, 105 S.Ct. at 3259-60.
Cleburne stands primarily for the proposition that irrational prejudice is not a legitimate state interest. And irrational prejudice can be inferred as the basis for a classification when there is no reason to believe that the disadvantaged class is different, in relevant respects, from similarly situated classes.
I would also note this recent gloss that the Court gave Cleburne in Bd. of Trustees of the Univ. of Alabama v. Garrett:
The [Cleburne] Court’s reasoning was that the city’s purported justifications for the ordinance made no sense in light of how the city treated other groups similarly situated in relevant respects. Although the group home for the mentally retarded was required to obtain a special use permit, apartment houses, other multiple-family dwellings, retirement homes, nursing homes, sanitariums, hospitals, boarding houses, fraternity and sorority houses, and dormitories were not subject to the ordinance.
531 U.S. 356, 366 n. 4,121 S.Ct. 955, 963 n. 4, 148 L.Ed.2d 866 (2001). Garrett also expressly rejected the theory that, under Cleburne, the mere presence of animus can fatally taint a statute against a rational-basis challenge:
Justice Breyer suggests that Cleburne stands for the broad proposition that state decisionmaking reflecting “negative attitudes” or “fear” necessarily runs afoul of the Fourteenth Amendment. Although such biases may often accompany irrational (and therefore unconstitutional) discrimination, their presence alone does not a constitutional violation make. As we noted in Cleburne: “[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for treating a home for the mentally retarded differently. ...”
Id. at 367, 121 S.Ct. at 964 (internal citations omitted) (emphasis added in Garrett).[6] In U.S. Dep’t of Agric. v. Moreno, *1281 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973), the Court found that Section 3(a) the Federal Food Stamp Act, which forbade assistance to any “household” wherein one member was unrelated to any other member, was not rationally related to any legitimate- state interest, including the proffered reasons, such as fraud prevention. This led to the Court to conclude that the only plausible rationale for the provision was to prevent hippie communes from taking advantage of food- stamp assistance. And this, by itself, was not a sufficient basis to sustain the provision: “a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest without reference to some independent considerations in the public interest.” Id. at 534, 93 S.Ct. at 2826 (emphasis mine).
I call particular attention to a later gloss on Moreno expressly disclaiming the theory that Moreno stands for something more than traditional rational-basis review:
[In Moreno,] we upheld an equal protection challenge to a provision of the Food Stamp Act and concluded that “a bare congressional desire to harm a politically .unpopular group cannot constitute a legitimate governmental interest.” This statement is merely an application of the usual rational-basis test: if a statute is not rationally related to any legitimate governmental objective, it cannot be saved from constitutional challenge by -a defense that relates it to an illegitimate governmental interest. Accordingly, in Moreno itself we examined the challenged provision under the rational-basis standard of review.
Lyng v. United Auto. Workers of America, 485 U.S. 360, 370 n. 8, 108 S.Ct. 1184, 1192 n. 8, 99 L.Ed.2d 380 (1988) (emphasis mine).
In Eiseñstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), the issue was whether a Massachusetts law that prevented dispensation of contraceptives to unmarried persons unless the purpose was to prevent disease violated the Equal Protection clause by treating married and unmarried persons differently. In Eisen-stadt, as in Romer, the fatal defect was not a determination that actual animus motivated the law, but that the proffered rationales were implausible. See id. at 449, 92 S.Ct. at 1036 (“Even on the assumption that the fear of pregnancy operates as a deterrent to fornication, the Massachusetts statute is thus so riddled with exceptions that deterrence of premarital sex cannot reasonably be regarded as its aim.”). As I understand it, the Eiseñstadt Court was not, as the dissent suggests, looking at the actual motivations behind the statute. Instead, the Court -simply found that the proffered reasons did not rationally relate to the scope of the legislation and, accordingly, the classification failed rational-basis review.
The Lofton panel concluded its analysis with the following observation: “Florida has made the determination that it is not in the best interests of its displaced children to be adopted by [homosexuals] ... and we have found nothing in the Constitution that forbids this policy judgment. Thus, any argument that the Florida legislature was misguided in its decision is one of legislative policy, not constitutional law. The legislature is the proper forúm for this debate, and we do not sit as a superlegisla-ture ‘to award by judicial decree what was not achievable by political consensus.’ ” *1282 Lofton, 358 F.3d at 827 (citation omitted). The dissent would have this court impose its putatively superior judgment on this policy issue and legislate from the bench. Such a breach of the separation of powers and departure from deference to the elected lawmakers of Florida, we have rejected. Only where the laws of Florida can be demonstrated to be irrational on any arguable basis or constitute a clear deprivation of a citizen’s fundamental rights should this court substitute its judgment for that of the Florida legislature. Thus, I turn to the alternative analysis by one of the dissents that finds such a fundamental right having been articulated in the Supreme Court’s decision in Lawrence.
The right to privacy that is the touchstone for a right to sexual intimacy by consenting adults (hereinafter “RSI/CA”) has its Supreme Court lineage and trajectory through the decisions in Griswold (1965),[7] Eisenstadt (1972),[8] Roe v. Wade (1973),[9] and Carey (1977),[10] and culminating with Lawrence (2003) (which leveled the only speed-bump in that trajectory, Bowers v. Hardwick (1986)[11]). There seems to be only one problem with this theory, albeit in the form of a footnote:
[T]he Court has not definitely answered the difficult question whether and to what extent the Constitution prohibits state statutes regulating private consensual sexual behavior among adults, and we do not purport to answer that question now.
Carey, 431 U.S. at 688 n. 5, 97 S.Ct. at 2018 n. 5 (internal punctuation and citation omitted). I suggest that the answer to Carey’s “difficult question” was not provided to us in Lawrence when viewed through an objective lens. I find that the most coherent lens through which to read Lawrence and its often enigmatic language is to recall that most of that language is devoted to explaining why the Court was not bound by its prior decision in Bowers. Perhaps the best way to explain this reading is to begin with the dissent’s chief critique of the Lofton panel’s interpretation of Lawrence. The dissent posits that the Lofton panel failed to recognize that Lawrence unequivocally held that consenting adults have a substantive due process right to engage in private intimate sexual conduct. This statement highlights well where the dissent and the Lofton panel part company. The first task in faithfully applying precedent, including that of the Supreme Court, is to look to the actual holding of the relevant precedent. That task requires examining the facts that were before the deciding court and ascertaining what conclusions of law were necessarily reached in disposing of the case.
A word-count approach as apparently employed by the dissent, in addition to being too formalistic, is problematic in practice. For example, my own unscientific survey of the words, phrases, sentences, and paragraphs used in Lawrence reveals not only language from which can be inferred a RSI/CA, but even stronger language from which we might infer any number of new rights, or even a new mandate in conducting constitutional review. See, e.g., 123 S.Ct. at 2475 (“The instant case involves liberty of the person both in its spatial and more transcendent dimen *1283 sions.”); id. at 2481 (“At the heart of liberty is the right to define one’s own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.”) (quoting Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 851, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992)); id. at 2483 (“[T]imes can blind us to certain truths and later generations can see that laws once thought necessary and proper in fact serve only to oppress. As the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom.”).
I realize these are outer examples, but they point to the importance of attentiveness to context in interpreting precedent— and in distinguishing binding language from advisory dicta. It was this distinction that the Lofton panel carefully made in construing Lawrence and its holding: “Lawrence’s holding was that substantive due process does not permit a state to impose a criminal prohibition on private consensual homosexual conduct.” Lofton, 358 F.3d at 815. I would add that this holding relied on two predicate legal conclusions: (1) that stare decisis did not require that Bowers’s precedent be followed and (2) that Texas’s sodomy prohibition did not further a legitimate state interest. It was necessary for the Court to reach the first conclusion because Bowers had upheld Georgia’s sodomy statute against, inter alia, a rational-basis challenge. And the second conclusion was all that was required to resolve the dispositive question of whether the Texas sodomy law was constitutional.
-To read Laiorence’s holding any broader would be to assume that the Court departed from the established principle of minimalism in deciding constitutional matters. Of course, the Court will so depart from time to time, usually when announcing a new rule of constitutional -law that will require frequent application by the lower courts (precedents like Miranda v. Arizona,[12] Strickland.v. Washington,[13] and BMW v. Gore[14] come to mind). And those decisions are typically accompanied with clear guideposts for applying the new rule. Lawrence does not appear to be such a case. We find in the opinion no such guideposts; there is no description of the scope of this putative fundamental right, no standard of review for scrutinizing infringements on that right, no balancing test, and so on.
What we do find in the Lawrence opinion by way of mandate is that Bowers is no longer to be treated as good law. Indeed, Bowers is its constant point of reference, and the unrelenting thrust of Lawrence’s analysis is to show that Bowers should not have reached the result it did. This begins in the first paragraph of the majority opinion’s analysis, where the Court announced, “[W]e deem it necessary to reconsider the Court’s holding in Boioers.” 123 S.Ct. at 2476. Virtually the entire remainder of the opinion is focused upon explaining Boioers’s shortcomings, culminating in the pronouncement that “Bowers was not correct when it was decided, and it is not correct today. It ought not to remain binding precedent. Bowers v. Hard-wick should be and now is overruled.” Id. at 2484. Having cleared Bowers from the books, the Court’s analysis spends- a mere two paragraphs on the facts of the Law *1284 rence case — and disposes of the case in a single sentence: “The Texas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.” Id.
An important point bears noting here. To say that Lawrence overruled Bowers is not to say that every question Bowers answered in the negative should now be answered in the affirmative (or vice ver-sa).[15] For example, although the Lawrence Court specifically noted that Bowers misframed the issue as one of whether there is a right to engage in sodomy, the Court never identified how Bowers should in fact have framed the inquiry — much less what the precise answer to that inquiry should have been. Id. at 2478. We see this pattern throughout the Lawrence opinion. The opinion contains extensive critique of Bowers’s answers to the questions raised in that case — but virtually no definitive answers to those questions, much less rules of law. Another example is Lawrence’s history discussion. After noting Bowers’s misframing of its inquiry, the Court went on to point out some of the “fundamental criticisms of the historical premises relied upon by the majority and concurring opinions in Bowers.” Id. (“Having misapprehended the claim of liberty there presented to it, and thus stating the claim to be whether there is a fundamental right to engage in consensual sodomy, the Bowers Court said: ‘Proscriptions against that conduct have ancient roots.’ ”). Here, again, the Court only pointed to shortcomings in Bowers’s analysis, but did not reach any conclusions itself, noting that “[w]e need not enter this debate in the attempt to reach a definitive historical judgment, but the following considerations counsel against adopting the definitive conclusions upon which Bowers placed such reliance.” Id.; see also id. at 2480 (“In summary, the historical grounds relied upon in Bowers are more complex than the majority opinion and the concurring opinion by Chief Justice Burger indicate. Their historical premises are not without doubt and, at the very least, are overstated.”).
In short, the critique of Bowers provides the necessary context for understanding the great bulk of Lawrence’s language— including much of the language that the dissent quotes in support of its RSI/CA argument. For example, the dissent’s main premise — that Lawrence “held that consenting adults have a right under the Due Process Clause to engage in private sexual conduct, including homosexual conduct,” Dissent (Barkett, J.) at 1303, relies heavily on the Court’s analysis of the privacy cases preceding Bowers, namely, Griswold, Eisenstadt, Roe, and Carey.
Far from engaging in an extensive analysis, the Court spent less than a page surveying these precedents. 123 S.Ct. at 2476-77. More importantly, rather than put any definitive gloss on these precedents, the Court canvassed them in order to point out that “[t]his was the state of the law with respect to some of the most relevant cases when the Court considered Bowers v. Hardwick.” Id. at 2477.
And so I return to my opening suggestion that the most coherent and objective lens through which to read Lavrrence is to recall that the purpose of the vast bulk of its analysis was to call into question and ultimately overrule Bowers. Of course, this still leaves open the thorny question of *1285 to what extent the Griswold line of cases— which no longer must be reconciled with Bcnuers — establish a RSI/CA, as well as what standard of review that right would trigger. The question is further complicated by Carey’s footnote 5, which .not only disavowed that those precedents had definitely established such a right, but also rejected the argument that strict scrutiny was the appropriate standard. See 431 U.S. at 688 n. 5, 97 S.Ct. at 2018 n. 5.
The dissent would have our court create a new fundamental substantive due process right where none has existed before. The Lofton panel and this court’s rejection of en banc review has declined such an activist approach and has sought to “exercise the utmost care whenever ... asked to break new ground” in the field of fundamental rights. Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 2268, 138 L.Ed.2d 772 (1997). I submit that the latter is the best advised course — particularly in this area where the Court appears to be breaking new ground, but has crafted its opinions to avoid fashioning bright-line rules and to limit its holdings to the facts of the immediate case.[16] In my view, the most judicious way to follow such precedents is to apply their holdings to cases involving the same facts and permit the Supreme Court itself to clarify the gray areas it has apparently (and perhaps intentionally) left for another day. It may well be that the Court in time takes its jurisprudence in the direction that the dissent advocates. But that, in my opinion, is a step for the Supreme Court to take.
The Lofton panel chose not to expand Lawrence through inference and extrapolation, but rather applied the holding of Lawrence to the facts at hand. Our reading finds its legitimacy in the following passage from Lawrence, a passage in which the Court clearly limited the scope of its holding:
The present case does not involve minors. It does not involve persons who might be injured or coerced or who are situated in relationships where consent might not easily be refused. It does not involve public conduct or prostitution. It does not involve whether the government must give formal recognition to any relationship that homosexual persons seek to enter. The case does involve two adults who, with full and mutual consent from each other, engaged in sexual practices common to a homosexual lifestyle. The petitioners are entitled to respect for their private lives. The State cannot demean their existence or control their destiny by making their private sexual conduct a crime. Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government. “It is a promise of the Constitution that there is a realm of personal liberty .which the government may not enter.” Casey, supra, at 847, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674. The Tqxas statute furthers no legitimate state interest which can justify its intrusion into the personal and private life of the individual.
123 S.Ct. at 2484.
As the Lofton panel explains, this case is different from Lawrence because this is not a criminal prosecution, because the state is not attempting to intervene in the private lives of any adults, because adoption is not a private act but a public one, and because, when it permits people to *1286 adopt, the state confers official status on them as adoptive parents. 358 F.3d at 817 (“the asserted liberty interest is not the negative right to engage in private conduct without facing criminal sanctions, but the affirmative right to receive official and public recognition”). This case is different from Lawrence, the Lofton panel opinion points out, because Florida’s statute does further a legitimate state interest. It furthers the legitimate interest the state has in encouraging what it deems to be the optimal family structure, a home that has both a mother and a father, id. at 819-20, or at least one parent in the heterosexual mainstream of American family life. The plaintiffs did not seriously contest the legal sufficiency of that state interest, but instead argued that the Florida law is not rationally related to that interest, an argument that the panel opinion thoroughly addresses. Id. at 820-26.
The dissent places great emphasis on the fact that the Court announced at the beginning of its opinion that “the case should be resolved by determining whether the petitioners were free as adults to engage in [their] private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution.” Lawrence, 123 S.Ct. at 2476. According to it, this language, along with the Court’s other references to due process “liberty,” requires that we interpret Lawrence as affirming a fundamental or substantive due process right to private consensual adult intimacy. It contends that this, in turn, requires that we subject the challenged Florida statute to “heightened scrutiny.”[17]
Then the dissent makes two related assumptions. First, it conflates substantive due process analysis and fundamental rights analysis — or at least treats the two as interchangeable. Second, it assumes that Lawrenee’s references to “liberty under the Due Process Clause” are tantamount to acknowledgment of a constitutional right deserving strict scrutiny protection. Upon close scrutiny, neither assumption is sound.
Admittedly, there is considerable overlap between substantive due process analysis and fundamental rights analysis. And the Supreme Court has at times used the term “substantive due process” as shorthand for its fundamental rights analysis. But a careful reading of the Court’s precedents indicates that its fundamental rights jurisprudence is but one subset of the various doctrines that emanate from the concept of substantive due process.
As our Chief Judge has noted, “In its application, substantive due process is a puzzling concept.” McKinney v. Pate, 20 F.3d 1550, 1567 (11th Cir.1994) (Edmondson, J., concurring). And even if I had the chutzpah to try, this would hardly be the place to solve that puzzle. I will, however, sketch a few principles that underlie my belief that there is no contradiction between the notion that Lawrence employed substantive due process analysis and the Lofton panel’s conclusion that Lawrence’s holding was a rational-basis holding.
As an initial matter, I would suggest that rational-basis review — like every standard of review that scrutinizes the substance of state action for irrationality and arbitrariness — is itself a form of substantive due process review. Although it is rarely classified as such, I find no other plausible constitutional source for its substantive review of state and federal legislative acts. Indeed, “the touchstone of due *1287 process is protection of the individual against arbitrary action of government.’ ” County of Sacramento v. Lewis, 523 U.S. 833, 845, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998). And it has long been understood that the concept of due process protects against not only procedural arbitrariness, but also substantive arbitrariness.[18] See Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986) (“And by barring certain government actions regardless of the fairness of the procedures used to implement them, [the due process guarantee] serves to prevent governmental power from being used for purposes of oppression.”).
As I understand it, this substantive scrutiny of governmental action is the primary source of the Court’s jurisprudence regarding fundamental, or unenumerated, rights (hereinafter, simply “fundamental rights”). However, the concept of substantive due process underlies other doctrines outside the field of fundamental rights. For example, I note that just last term the Court reaffirmed its line of cases holding that there are “substantive constitutional limitations” on the size and severity of civil punitive damage awards. State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003).[19] Another example is the “shocks the conscience” test, under which courts consider whether the substance of actions by governmental officers is fatally arbitrary.[20]
*1288 I note these examples to underscore my point that rational-basis review likewise is a form of substantive review, albeit a deferential one, that protects against the arbitrary and irrational exercise of legislative power in enacting economic and social legislation. See, e.g., Washington v. Glucksberg, 521 U.S. 702, 766, 117 S.Ct. 2258, 2282, 138 L.Ed.2d 772 (1997) (Souter, J., concurring) (canvassing the history of substantive due process and describing rational-basis review as one method, along with fundamental rights analysis, and scrutinizing state action for arbitrariness).[21] Accordingly, unlike the dissent, I do not find any incompatibility between (a) the Lawrence Court’s assertion that “the case should be resolved by determining whether the petitioners were free as adults to engage in [their] private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution” and (b) the Lof-ton panel’s conclusion that the Court ultimately based its holding on rational-basis grounds.
With regard to the dissent’s second implicit assumption, I would submit that the mere fact that a liberty interest receives substantive protection under the Due Process Clause does not automatically trigger strict scrutiny. Based on its interpretation that Lawrence recognizes a substantive liberty interest, the dissent contends that any burden to that liberty interest requires strict scrutiny. Its chief exhibits are various lines from Lawrence that allude to the petitioners’ liberty under the Due Process clause. See, e.g., Lawrence, 123 S.Ct. at 2476 (“We conclude the case should be resolved by determining whether the petitioners were free as adults to engage in the private conduct in the exercise of their liberty under the Due Process Clause of the Fourteenth Amendment to the Constitution.”); id. at 2478 (“The liberty protected by the Constitution allows homosexual persons the right to make this choice.”); id. at 2484 (“Their right to liberty under the Due Process Clause gives them the full right to engage in their conduct without intervention of the government.”).
The dissent translates these general references to “liberty” under the Due Process Clause into a specific due process right to engage in private sexual conduct. The dissent appears to be: (multiple references to Due Process liberty) + (decision finding Texas sodomy statute unconstitutional) = (holding that there is a substantive due process right to sexual intimacy). But even if I were persuaded that Lavtrence announced, or “reaffirmed,” a substantive due process right to sexual intimacy, I still am not convinced that burdens on this right necessarily would require strict scrutiny. First, as the Lofton panel observed, the Lawrence Court itself never applied, nor used any of the language of, strict scrutiny. Lofton, 358 F.3d at 817. Second, with all due respect, as cryptic as some of the Supreme Court’s substantive *1289 due process precedents are, my recent review of them convinces me of this much: the mere presence of a substantive liberty interest does not automatically trigger strict scrutiny, as the dissent seems to suggest.
Indeed, even cursory research has revealed several instances in which the Court identified a substantive right under the Fourteenth Amendment — and yet did not require strict scrutiny. I note briefly two examples. The most recent is Sell v. United States, 539 U.S. 166, 123 S.Ct. 2174, 156 L.Ed.2d 197 (2003), issued only days before the Laurrence opinion. The Sell Court vacated the conviction of a murder defendant who had been administered antipsychotic medication against his wishes in order to render him competent to stand trial. What I find significant is that the Court identified a “constitutionally protected liberty interest in avoiding the unwanted administration of antipsychotic drugs,” id. at 178, 123 S.Ct. at 2183 (internal quotation marks omitted) (emphasis mine), and then proceeded to articulate a standard of review lower than strict scrutiny — “necessary significantly to further important governmental trial-related interests,” id. at 179, 123 S.Ct. at 2185.
The second case I note is City of Chicago v. Morales, 527 U.S. 41, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999). There, the plurality opinion recognized, in language similar to that employed in Lawrence, that “the freedom to loiter for innocent purposes is part of the ‘liberty’ protected by the Due Process Clause of the Fourteenth Amendment.” Id. at 53, 119 S.Ct. at 1857. See also id. at 54, 119 S.Ct. at 1858 (“[A]n individual’s decision to remain in a public place of his choice is as much a part of his liberty as the freedom of movement inside frontiers that is ‘a part of our heritage.’ ”). I call attention to the fact that, despite using this substantive due process language, the Morales plurality never hinted at the applicability of strict scrutiny (and instead struck down Chicago’s gang loitering statute on vagueness grounds — a decision that nevertheless was predicated on the existence of this “constitutionally protected liberty” to loiter innocently, id. at 55, 119 S.Ct. at 1858).[22]
In sum, a closer and careful reading of Laturence and other relevant precedents indicate that, even if Lawrence’s dicta did *1290 acknowledge a constitutional liberty interest in private sexual intimacy, this liberty interest does not rise to the level of a fundamental right nor does it necessarily trigger strict scrutiny.
I will conclude on a purely personal note. If I were a legislator, rather than a judge, I would vote in favor of considering otherwise eligible homosexuals for adoptive parenthood. In reviewing the record in this case one can only be impressed by the courage, tenacity and devotion of Messrs. Lofton and Houghton for the children placed in their care. For these children, these men are the only parents they have ever known. Thus, I consider the policy decision of the Florida legislature to be misguided and trust that over time attitudes will change and it will see the best interest of these children in a different light. Nevertheless, as compelling as this perspective is to me, I will not allow my personal views to conflict with my judicial duty — conduct that apparently fewer and fewer citizens, commentators and Senators seem to understand or appreciate. And, I hasten to add, the vast majority of federal judges, including each and every judge of the Eleventh Circuit, are similarly sensitive to separate their personal preferences from their duty to follow precedent as they understand it.

. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

. U.S. Dep’t of Agric. v. Moreno, 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

. City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

. Romer v. Evans, 517 U.S. 620, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

. Lawrence v. Texas, 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003).

. With regard to the argument that actual motivation is relevant on rational basis review, Garrett observes that "the State need *1281 not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification.” Id. at 367, 121 S.Ct. at 964 (internal quotation marks omitted) (emphasis mine).

. Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, (1965).

. Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972).

. 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

. Carey v. Population Srvs. Int'l, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).

. 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986).

. 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

.BMW of North America, Inc. v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

. For an even narrower interpretation of the extent to which Bowers was overruled, see Justice Scalia's dissent. Because the resolution of the instant case only required reaching the rational basis of the challenged statute, it was Justice Scalia's suggestion that Lawrence only overruled the rational-basis aspect of Bowers's holding, but left intact its fundamental-rights holding. 123 S.Ct. at 2488 (Scalia, J., concurring).

. Cf. Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati, 1998 WL 101701 (6th Cir. Feb. 5, 1998) (Boggs, J„ concurring in denial of rehearing en banc) ("Even the staunchest proponents of the Supreme Court's decision in Romer v. Evans readily admit that the .Court in that case purposely crafted a narrow opinion focused on the precise factual situation presented by Colorado's Amendment 2.”) • (citation omitted).

. The dissent repeatedly refers to this "heightened scrutiny,” but never expressly specifies what standard of review it would entail. However, it appears to be strict scrutiny. See Dissent (Barkett, J.) at 1312 ("a compelling and narrowly tailored justification”).

. In Lewis, the Court stated:
We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective, see, e.g., Daniels v. Williams, 474 U.S. at 331, 106 S.Ct. 662 (the substantive due process guarantee protects against government power arbitrarily and oppressively exercised). While due process protection in the substantive sense limits what the government may do in both its legislative and its executive capaci- . ties, criteria to identify what is fatally arbitrary differ depending on whether it is legislation or a specific act óf a governmental officer that is at issue. '
523 U.S. at 845, 118 S.Ct. at 1716 (internal citations omitted) (emphasis mine).

. See also State Farm Mutual Auto. Ins. Co. v. Campbell, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519-20, 155 L.Ed.2d 585 (2003) ("The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfea-sor.”); id. at 417, 123 S.Ct. at 1520 ("Despite the broad discretion that States possess with respect to the imposition of-criminal penalties and punitive damages, the Due Process Clause of the Fourteenth Amendment to the Federal Constitution imposes substantive limits on that discretion”) (internal quotation marks omitted) (emphasis mine).

. See, e.g., Lewis, 523 U.S. at 846, 118 S.Ct. at 1716 ("[I]n Collins v. Harker Heights, we said again that the substantive component of the Due Process Clause is violated by executive action only when it can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.”) (internal citation and quotation marks omitted); id. at 850, 118 S.Ct. at 1718-19 ("[O]ur concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience-shocking.”); Collins v. Harker Heights, 503 U.S. 115, 128, 112 S.Ct. 1061, 1070, 117 L.Ed.2d 261 (1992) (reasoning that city's failure to properly warn its employees about known risks of harm was not "conscience shocking, in a constitutional sense”); United States v. Salerno, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987) ("So-called 'substantive due process' prevents the government from engaging in conduct that 'shocks the conscience.’ ”); Rochin v. California, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952) ("Due process of law is a summarized constitutional guarantee of respect for those personal immunities which ... are so rooted in the traditions and conscience of our people as to be ranked as fundamental, ... or are implicit in the con *1288 cept of ordered liberty.”) (internal citations and quotation marks omitted).

. The Supreme Court's language in Concrete Pipe & Prods, v. Construction Laborers Pension Trust, 508 U.S. 602, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993), illustrates well this overlap between substantive due process and rational-basis review. The Concrete Pipe Court upheld an ERISA provision against, inter alia, what the Court described as a "substantive due process” challenge. Although characterizing its analysis as substantive due process analysis, the Court applied classic rational-basis review in upholding the provision. Noting "the deferential standard of review applied in substantive due process challenges to economic legislation,” id. at 639, 113 S.Ct. at 2288, the Court concluded that the challenged statute was "rationally related to the terms of Concrete Pipe’s participation in the Plan it joined and that suffices for substantive due process scrutiny of this economic legislation,” id. at 641, 113 S.Ct. at 2289 (emphasis mine).

. Also, in a somewhat older case, Youngberg v. Romeo, the Court examined "for the first time the substantive rights of involuntarily committed mentally retarded persons under the Fourteenth Amendment.” 457 U.S. 307, 314, 102 S.Ct. 2452, 2457, 73 L.Ed.2d 28 (1982). The Court concluded that the respondent, an institutionalized mental incompetent, "enjoy[ed] constitutionally protected interests in conditions of reasonable care and safety, reasonably nonrestrictive confinement conditions, and such training as may be required by these interests.” Id. at 324, 102 S.Ct. at 2462. Throughout its opinion, the Court referred to the respondent’s substantive liberty interests — yet never treated this liberty as meriting strict scrutiny. See, e.g., id. at 315, 102 S.Ct. at 2458 ("the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause”); id. ("liberty from bodily restraint always has been recognized as the core of the liberty protected by the Due Process Clause from arbitrary governmental action”) (internal punctuation omitted); id. at 318, 102 S.Ct. at 2459 ("we have recognized that there is a constitutionally protected liberty interest in safety and freedom from restraint”). Having "established that [the respondent] retained] liberty interests in safety and freedom from bodily restraint,” the Court turned to the question of the proper standard for determining whether his “substantive right protected by the Due Process Clause ha[d] been violated.” Id. at 319, 102 S.Ct. at 2460. The Court ultimately employed a standard of review considerably lower than strict scrutiny (whether the State exercised professional judgment in protecting the rights of its involuntarily committed mentally retarded citizens). Id. at 321, 102 S.Ct. at 2461.